United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TIMOTHY MICHAEL RYAN,

Plaintiff,

v.

CITY OF OAKLAND, et al.,

Defendants.

Case No. 22-cv-00521-DMR

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 24

Plaintiff Timothy Ryan, a journalist, alleges that members of the Oakland Police Department ("OPD") violated his constitutional rights when they deployed tear gas against him and other attendees at a protest in Oakland following the murder of George Floyd. Defendants City of Oakland, Captain Roland Holmgren, and Sergeant Patrick Gonzales (collectively, "Defendants") now move to dismiss several claims in Plaintiff's Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). [Docket No. 24 ("Mot.").] Ryan opposed, and Defendants replied. [Docket Nos. 27 ("Opp'n"), 28 ("Reply").] The court held a hearing on October 13, 2022. For the foregoing reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

The following facts are derived from the SAC.[1] On June 1, 2020, Ryan attended a protest held after George Floyd's murder—the fourth consecutive night of demonstrations in Oakland protesting police violence. SAC ¶ 9. At the time, Ryan worked as a reporter for KCBS Radio. *Id.*

[1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

¶ 10. On the night of the demonstration, he was clearly identified as a working journalist: he wore a helmet with the word "PRESS," had his KCBS press identification attached to his belt and carried a digital recorder. *Id.*

At approximately 7:40 p.m., while Ryan was located at the corner of Broadway Street and Ninth Street and standing on a raised entry way positioned above the crowd by around thirty inches, OPD officers began deploying tear gas toward protestors and journalists, including Ryan. SAC ¶¶ 17-18. OPD members were present in and behind an officer-formed skirmish line and knew that the crowd included people who were peacefully protesting as well as journalists reporting on the protests and police responses to the protests. *Id.* ¶ 17. Immediately prior to the tear gas deployment, Gonzales reported into his body worn camera that there were no children or senior citizens in the crowd. *Id.* ¶ 19.

Ryan suffered difficulty breathing, a burning sensation in his eyes, nose, and throat, and feelings of panic due to the tear gas. SAC ¶ 25. As he attempted to flee the sidewalk where he was standing, Ryan tripped and fell, causing a near total full thickness tear in his right anterior talofibular ligament, a partial tear of his right calcaneofibular ligament, and a non-displaced fracture of the fifth metatarsal bone of his right foot. *Id.* ¶ 26. He had to undergo surgery and suffered permanent and temporary disability. *Id.* ¶ 27.

On the day of the protest, Holmgren was serving as the Department's Incident Commander and had full authority over the tactics and weapons use of all OPD officers as well as officers sent to Oakland by mutual aid partners. SAC ¶ 11. He was also responsible for examining uses of force and their justifications and writing an after-action report for OPD's chain of command. *Id.* ¶ 13. As Incident Commander on three of the four nights of demonstrations against police violence (May 29, 2020, May 31, 2020, and June 1, 2020), Holmgren witnessed or was briefed on allegedly unlawful uses of force on at least two nights preceding June 1, 2020. *Id.*

Gonzales was serving as the supervisor of OPD's Tactical Operations ("Tango") Team, which was authorized and equipped to deploy tear gas and other less-lethal weapons to support crowd control operations. SAC ¶ 15. Gonzales was also the Special Operations Tactical Sergeant, and as such, conducted a portion of the training given to the Tango Team, including officers

United States District Court
Northern District of California

present at the demonstration. *Id.* ¶ 16. The training purportedly included how to comply with OPD's crowd control policy, which directs that "the discharge of a chemical agent shall not be used in demonstrations or other crowd events without the approval of the Incident Commander." *Id.* ¶¶ 14, 16. It allows for an exception under exigent circumstances. *Id.* ¶ 14.

On June 1, 2020, Holmgren preauthorized sergeants such as Gonzales to direct the use of chemical agents, allowing them to do so absent exigent circumstances; Gonzales, in turn, preauthorized his subordinates to use chemical agents against demonstrators. SAC ¶ 14. Ryan alleges that OPD officers ultimately failed to distinguish between peaceful and lawful protestors, journalists, and people engaged in violence or unlawful activity, and that no "exigent circumstances" existed that warranted deployment of tear gas under OPD policy. *Id.* ¶¶ 20-21.

In the SAC, Ryan claims civil rights violations against Defendants under 42 U.S.C. § 1983. Specifically, he alleges: (1) a First Amendment retaliation claim against Gonzales; (2) a Fourth Amendment excessive force claim against Gonzales; (3) a Fourth Amendment failure to intervene claim against Gonzales; (4) a Fourth Amendment claim for failure to train and failure to supervise under *Monell* against City of Oakland; and (5) a claim for supervisory liability against Holmgren and Gonzales. Defendants move to dismiss the first, fourth, and fifth claims only.[2]

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the

[2] Defendants do not challenge the SAC's second and third claims for relief. *See* Mot. at 3 n.1.

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading. Fed. R. Civ. P. 15(a)(1). After that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be given "freely…when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted). However, leave to amend may be denied "where the amendment would be futile." *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).

## III. DISCUSSION

### A. First Amendment Claim

"A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). A First Amendment retaliation claim requires that the plaintiff allege "(1) it engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Id.* To prevail, "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). "Specifically, a plaintiff must show that the defendant's retaliatory animus was 'a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Id.* (quoting *Nieves*, 139 S. Ct. at 1722). "This element of a First Amendment retaliation claim may be met with either direct or circumstantial evidence." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th

Cir. 2020); *see also Mendocino Env't Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300–01 (9th Cir. 1999). At the pleading stage, however, the plaintiff need only "allege[] plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct." *Ariz. Students' Ass'n*, 824 F.3d at 870.

The parties dispute the sufficiency of Ryan's allegations as to the third element of his claim—the causal nexus between Ryan's status as a journalist and Gonzales' conduct.[3] Reply 2; Opp'n 4. According to Defendants, where officers' actions did not distinguish between peaceful protestors and journalists covering the protests, "it cannot be inferred that Plaintiff's presence – even if it was known to Gonzales – was any sort of motivating factor for the use of tear gas[.]" Mot. 5. Plaintiff responds it is not necessary to demonstrate that Gonzales meant harm to Ryan specifically; it is sufficient to plead that he "harbor[ed] general retaliatory intent towards the demonstration." Opp'n 5.

None of the cases cited by Defendants preclude a plausible inference of retaliation where a chemical agent is deployed against both a journalist and peacefully protesting attendees. Defendants' reliance on *Index Newspapers v. U.S. Marshals Serv.* is not persuasive. There, the Ninth Circuit held that the district court had provided "exceptionally strong evidentiary support" for its finding that defendants were motivated to target journalists and demonstrators in retaliation for exercising their First Amendment rights. *Index Newspapers*, 977 F.3d at 827-29. That the inference of retaliation was particularly strong because "plaintiffs were standing nowhere near protesters" or because plaintiffs were pepper sprayed "at point blank range[,]" "shot in the chest," "shot at[,]" or "shoved away[,]" does not mean that a plaintiff cannot be targeted under a different set of facts. *See id.* at 829.

Similarly, Defendants' reliance on *Index Newspapers LLC v. City of Portland* is inapposite. There, the court reviewed testimony and videos in connection with a motion for preliminary injunction to determine whether pepper spray used during protests supported a finding

[3] Multiple circuits have "recognized the public's First Amendment right to observe and film police activities in public." *Index Newspapers*, 977 F.3d at 827 & n. 4 (citing cases and finding no "good faith basis" to challenge that journalists-plaintiffs were engaged in a constitutionally protective activity).

that journalists or legal observers were targeted rather than inadvertently hit. *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1144 (D. Or. 2020). At the pleading stage, Ryan need only "allege[] plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct." *Ariz. Students' Ass'n*, 824 F.3d at 870.[4]

Here, the SAC alleges that Gonzales scanned the crowd, saw Ryan—"perched thirty inches above the crowd"—identified him as press based on his gear and attire, confirmed that specific groups of individuals—"children and senior citizens"—were not present in the crowd, and nevertheless directed subordinates to deploy tear gas toward protestors and journalists, including Ryan. SAC ¶¶ 10, 17, 18, 19. These allegations are akin to those in *Johnson*, where plaintiffs stated they were "peacefully participating in the demonstration either as protesters or journalists documenting the march, [when] Berkeley police officers repeatedly struck them with batons, and in some instances, deployed tear gas." *Johnson v. City of Berkeley*, No. 15-CV-05343-JSC, 2016 WL 928723, at *1 (N.D. Cal. Mar. 11, 2016). There, the court held that plaintiffs had alleged sufficient facts to infer that "had [they] not been participating in the demonstration—either as protesters or journalists—[plaintiffs] would not have been subject to the use of force or arrested." *Id.*, at *5. Defendants suggest that the court's reasoning in *Johnson* was solely premised on allegations of direct uses of force against journalists. *See* Reply 3. This overstates the holding. Although journalists in *Johnson* alleged that police officers used excessive force against each of them specifically, the court did not foreclose the possibility of inferring retaliation where force is deployed against both the plaintiff and others.

Plaintiff's allegations are sufficient to support an inference that he was targeted for his status as a journalist when Gonzales directed officers to deploy tear gas towards a crowd that he

[4] The remaining cases Defendants rely on do not grapple with the relevant facts: deployment of a chemical agent against both the plaintiff and demonstrators. For example, some of the cases cited by Defendants do not involve a protest. *See, e.g.*, *Green v. Bd. of Regents of the Univ. of California*, No. 221CV04077RGKAFM, 2021 WL 6751903 (C.D. Cal. Oct. 22, 2021) (analyzing arrest of journalist-plaintiff while filming outside a university hospital during the COVID-19 pandemic). Other cases pertain to an arrest rather than the use of chemical agents. *See, e.g.*, *Eberhard v. California Highway Patrol*, No. 3:14-CV-01910-JD, 2015 WL 6871750 (N.D. Cal. Nov. 9, 2015); *Morse v. San Francisco Bay Area Rapid Transit Dist. (BART)*, No. 12-CV-5289 JSC, 2014 WL 572352 (N.D. Cal. Feb. 11, 2014). These cases do not shed light on the issue.

knew included both journalists and demonstrators. *See* SAC ¶¶ 17-18; *cf. Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750-51 (9th Cir. 2001) (affirming summary judgment where there was no evidence to support the fact that defendant had any knowledge of plaintiff's protected activity). Accordingly, Defendants' motion to dismiss is denied as to Ryan's First Amendment claim.

**B. Fourth Amendment *Monell* Claim**

A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)). However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis in original). It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citations omitted). Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). An official municipal policy may be either formal or informal. *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (acknowledging that a plaintiff could show that "a municipality's actual policies were different from the ones that had been announced.").

In the Ninth Circuit, a municipality may be liable under section 1983 under three possible theories. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018). The first is where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." *Id*. (quoting

United States District Court
Northern District of California

*Monell*, 436 U.S. at 694).

Second, "a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Rodriguez,* 891 F.3d at 802 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Finally, a municipality may be liable under section 1983 if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Rodriguez*, 891 F.3d at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (internal quotation marks and citation omitted)).

Ryan alleges municipal liability under a failure to train and supervise theory. SAC ¶¶ 38-41.[5] Defendants move to dismiss the claim against City of Oakland.

Under limited circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. In order to establish liability under this theory, the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)). This "stringent standard of fault" requires proof that "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61; *see also Canton*, 489 U.S. at 389 ("[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). Similarly, "[a] failure to supervise that is 'sufficiently inadequate' may amount

[5] At the hearing, Plaintiff confirmed that the SAC alleges a *Monell* claim based solely on City of Oakland's alleged failure to train and supervise. The court limits its analysis accordingly.

to 'deliberate indifference.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir.1989)). Mere negligence in training or supervision, however, does not give rise to a *Monell* claim. *Id.*

In *City of Canton*, the court addressed the circumstances under which a municipality can be held liable under section 1983 based on inadequate training, describing the inquiry as follows:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. [citations omitted]. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Arteaga v. City of Oakley*, No. 19-CV-05725-JCS, 2020 WL 511876, at *7 (N.D. Cal. Jan. 31, 2020) (quoting *Canton v. Harris*, 489 U.S. at 390-91).

Here, Ryan alleges that City of Oakland failed to adequately train and supervise OPD officers to refrain from using tear gas and excessive force and was deliberately indifferent to the consequences of those actions. SAC ¶¶ 38-41. These allegations are conclusory and lack factual support. Although the SAC alleges that Gonzales conducted a training for Tango Team members (SAC ¶ 16), it contains no allegations about how this training was deficient.[6] To the contrary, the SAC states that Gonzales' training "purportedly" taught officers how to comply with OPD's crowd control policy. SAC ¶ 16. In the same vein, Plaintiff alleges that Holmgren acted "in dereliction of his duty as Incident Commander" and Gonzales acted "in violation of the policy" when they preauthorized subordinates to use chemical agents on June 1, 2020. *Id.* ¶ 14. These allegations suggest that the deployment of tear gas was not the result of a failure to train by City of

[6] Plaintiff argues that "officers were not trained to refrain from using excessive force to suppress speech" but does not allege any facts to support this claim. *See* Opp'n 7.

Oakland, but the Defendants' failure to follow instructions. *See J.K.J. v. City of San Diego*, 42 F.4th 990, 999 (9th Cir. 2021) ("The[] allegations suggest that the moving force behind the alleged constitutional violation was not a failure to train, but the officers' failure to heed their training.").

Ryan's failure to supervise claim is also conclusory. Plaintiff argues that City of Oakland was aware that its officers were using unlawful force to suppress speech because OPD's chain of command received after action reports that examined uses of force on each night of the demonstrations. Opp'n 7; *see* SAC ¶ 13. He further contends that instead of correcting this behavior, Holmgren and Gonzales "gave more authority to officers to use force without supervisor approval." Opp'n 7. A municipality may be held liable "only for '[its] *own* illegal acts.'" *Connick*, 563 U.S. at 60 (emphasis in original) (citation omitted). The SAC does not allege that Holmgren or Gonzales were City of Oakland's "lawmakers" or "policymaking officials," nor do their titles support such an inference. *See id.* at 61. Without more, these allegations do not adequately distinguish acts of City of Oakland from acts of its employees, and therefore cannot establish municipal liability. *See Pembaur*, 475 U.S. at 479-80.

Accordingly, the SAC fails to state a *Monell* claim based on a failure to train or supervise. The claim against City of Oakland is dismissed.

### C. Supervisory Liability Claim

Supervisory officials may be liable under section 1983 for violations of a plaintiff's constitutional rights but they "may not be held liable under Section 1983 for the unconstitutional actions of their subordinates based solely on a theory of respondeat superior." *Moss v. U.S. Secret Serv.*, 711 F.3d 941, 967 (9th Cir. 2013), *rev'd sub nom. on other grounds, Wood v. Moss*, 134 S. Ct. 2056 (2014) (citation omitted). A defendant may be held liable as a supervisor under section 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). The supervisor defendant need not be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." *Id.* at 1205. If a supervisory official is not directly involved in the

allegedly unconstitutional conduct, then "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). Liability can be established if the supervisor "knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known would cause others to inflict a constitutional injury." *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001).

Ryan alleges that Holmgren and Gonzales "personally participated in the series of events that resulted in plaintiff RYAN's constitutional, physical, and emotional injuries" and "failed in their obligation to adequately train and supervise officers to refrain from using tear gas and excessive force[.]" SAC ¶ 43. At the hearing, Plaintiff conceded that the claim against Holmgren is based solely on an alleged failure to supervise. Defendants move to dismiss both supervisory liability claims.

**1. Holmgren**

Defendants argue it is not enough for Holmgren to have preauthorized agents to direct the use of chemical agents because "personal involvement" in the violation must be direct—not simply based on a defendant's organizational role. Mot. 7. Plaintiff responds that the supervisory liability claim against Holmgren is adequately pleaded because the SAC makes numerous allegations about Holmgren's actions and inactions. Opp'n 8.

Defendants rely on *Moss* and *Felarca* to argue that the allegations regarding Holmgren's personal involvement do not suffice to state a claim. Opp'n 7-8.[7] However, in *Moss*, plaintiffs made "no allegation that the supervisors took any specific action resulting in the use of excessive force by police officers on the scene of the … demonstration." 711 F.3d at 968. Likewise, in

[7] Defendants also cite *Flores* and *Hyde* to argue that Plaintiff is required to plead "deliberate indifference." Mot. 8. Both cases involve failure to train claims. *See Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014); *Hyde v. City of Willcox*, 23 F.4th 863, 874-75 (9th Cir. 2022). As Plaintiff's supervisory liability claim against Holmgren is limited to an alleged failure to supervise, the court does not rely on these cases to reach its decision.

*Felarca*, the allegations against defendants were sparse. There, the court found no supervisory liability where plaintiffs failed to allege that defendants had supervisory authority over the police who committed the alleged violations or connect defendants' actions to the force applied by each police officer. *See Felarca v. Birgeneau*, 891 F.3d 809, 820-21 (9th Cir. 2018).[8]

In contrast, Ryan specifically alleges that Holmgren was serving as OPD's Incident Commander when he preauthorized sergeants to use chemical agents against demonstrators—allowing them to do so absent exigent circumstances. SAC ¶ 14. The SAC further states that, as a result, Gonzales preauthorized his subordinate officers to do the same. *Id.* These allegations sufficiently establish a causal connection between Holmgren's wrongful conduct—preauthorizing officers to direct the use of chemical agents in violation of OPD policy—and the constitutional violation—deployment of tear gas on the same day without the existence of exigent circumstances. *See Starr*, 652 F.3d at 1207-08 ("The requisite causal connection can be established ... by setting in motion a series of acts by others[.]") (citation omitted).

Accordingly, Plaintiff's factual allegations are sufficient at the pleading stage to support a cognizable supervisory liability claim against Holmgren based on a failure to supervise theory.

**2. Gonzales**

**a. Failure to train**

Defendants argue that the supervisory liability claim against Gonzales should be dismissed because it is duplicative of other claims in the SAC and fails to allege a duty to train, any defect in training, or a causal connection between the alleged defect and the violation of Plaintiff's constitutional rights. Mot. 8. Plaintiff asks the court to infer that Gonzales' training and supervision were deficient because his subordinates used excessive force against demonstrators on June 1, 2020. *See* Opp'n 11.

Although Plaintiff alleges that Gonzales had a duty to train officers and in fact trained officers present at the June 1, 2020 demonstration (SAC ¶ 16), his claim fails to allege how

---

[8] Where some plaintiffs in *Felarca* alleged direct uses of force by officers under defendants' command, the court did not decide whether plaintiffs' supervisory liability claim was sufficiently pled; instead, the court granted summary judgment on qualified immunity grounds. *Felarca*, 891 F.3d at 821-23.

Gonzales' training was deficient. *See Moss*, 711 F.3d at 968 (finding plaintiffs' allegations conclusory where they alleged no facts about the officers' training or specified in what way the training was deficient). Instead, Plaintiff alleges that Gonzales' training "purportedly" included how to comply with OPD's crowd control policy, which itself prescribes when and how force may be used during a demonstration. SAC ¶ 16. Where a training is alleged to cover compliance with a policy, and that policy is not itself alleged to be deficient, the SAC cannot support a reasonable inference that the training must have been deficient simply because officers who attended Gonzales' training unlawfully deployed tear gas. *See Johnson*, 2016 WL 928723, at *4 ("[A]llegations of inadequate or improper training on their own are insufficient unless accompanied by facts about the officers' training or supervision and specifics regarding why any such training was deficient.") (internal quotation marks and alterations omitted).

**b. Failure to supervise**

Defendants argue that Ryan's failure to supervise claim against Gonzales is both "duplicative" and "undescribed[.]" Mot. 8. Plaintiff responds that the SAC sufficiently alleges that Gonzales was present and directly supervising officers on June 1, 2020, and even if the claim is duplicative, it should not be dismissed because plaintiffs may identify multiple legal theories. Opp'n 10.

The SAC alleges that Gonzales had supervisory authority over the officers who deployed chemical agents on June 1, 2020, and that Gonzales in fact pre-authorized his officers to use chemical agents that day. SAC ¶¶ 14-15. As with Holmgren, these allegations establish a sufficient causal connection between Gonzales' actions and the deployment of tear gas by OPD officers supervised by Gonzales. *See Starr*, 652 F.3d at 1207-08.

To the extent Ryan's supervisory liability claim against Gonzales is duplicative of other claims in the SAC, the federal rules allow plaintiffs to rely on alternative allegations and theories of liability. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."); *see also Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (instructing that a claim for unjust enrichment should not be dismissed as duplicative or superfluous of other claims

because a party may set out alternative claims) (citation omitted).

Plaintiff's factual allegations are sufficient to support a cognizable supervisory liability claim against Gonzales based on a failure to supervise theory.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to the *Monell* claim against City of Oakland. The motion to dismiss is otherwise denied. Ryan does not request leave to amend, and the court finds that further amendment at this stage would be futile. Accordingly, the *Monell* claim is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: November 4, 2022

Donna M. Ryu
United States Magistrate Judge